**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2851-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JORGE M. RAMOS-COMPRES,

    Defendant-Appellant.

_____

Submitted December 11, 2024 – Decided January 22, 2025

Before Judges Mayer and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 13-06-0607.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Ruth E. Hunter, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Timothy Kerrigan, Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jorge M. Ramos-Compres appeals from a June 29, 2016 judgment of conviction on weapons charges and an August 18, 2017 judgment of conviction for aggravated manslaughter. In the alternative, defendant challenges the sentences imposed. We affirm.

Defendant was charged in connection with a shooting near a Home Depot in Passaic on January 8, 2013, resulting in the death of Alex Siri. On the night of the shooting, defendant occupied one of several cars riding around the area. Two of defendant's friends, Jean Carlos Rosario and Pedro Flores, drove in different cars from defendant. According to the trial testimony, the occupants of the cars were looking for a fight.

While driving, defendant and others approached a group of people walking near the Home Depot. The group included Siri, Victor Matos, and John Zavala. Zavala testified he heard gunshots fired from behind where the group was walking. However, he did not clearly see the shooter. Zavala testified he then heard more "pops" and saw another shooter, subsequently identified as Christian Mejia, return gun fire. Zavala explained Mejia, who rode a bicycle, shot in the direction of the first shooter.

A-2851-21

Mejia was Siri's friend. According to the trial testimony, Mejia carried his own gun that night. After hearing shots fired and fearing for his life, Mejia fired his weapon in the direction of the first shooter.

Zavala testified he saw the first shooter on the same side of the street at a distance of ten to twelve feet away. Zavala stated the first shooter wore a dark jacket and a hat, stood about five feet, nine inches tall, and weighed approximately one-hundred-eighty pounds.

Rosario testified defendant, wearing black clothing and a ski mask, got out of a car holding a gun. Rosario saw defendant run toward the group of people. Rosario then heard two gunshots fired from his side of the street and multiple gunshots fired from across the street. Surveillance video of the area that night showed defendant running and holding a gun.

Two days after the shooting, officers from the Passaic Police Department arrested defendant at his place of work in Sussex County around 4:00 a.m. At the time of his arrest, defendant retrieved a black jacket from the cafeteria at his place of work.

The arresting police officers drove defendant from his place of work to police headquarters in Passaic to be interrogated. The interrogating officers first met with defendant around 10:30 a.m. on the day of his arrest. Prior to speaking

3

with defendant, Detective John Rodriguez of the Passaic Police Department read defendant his Miranda[1] rights in Spanish. After reviewing the Miranda waiver form, defendant initialed and signed the form, agreeing to waive his rights and speak to the police. The police videotaped the interrogation sessions.[2]

During his first recorded statement, defendant denied being present at the shooting. Defendant further claimed he did not know what happened that night. However, Rodriguez told defendant that testing confirmed the presence of gun residue on defendant's hand. Despite this information, defendant insisted he knew nothing about the shooting. Detective Rodriguez grew frustrated with defendant's non-responses to questions regarding the shooting and ended the first interrogation session.

Approximately two to three hours later, around 1:00 p.m., defendant asked to speak to Rodriguez again. Just before the start of the second interrogation session, the detective displayed defendant's earlier signed Miranda waiver form and asked defendant if he remembered reviewing and signing the document.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] The police recorded defendant's interrogation in three separate sessions. All three recorded sessions took place on the same day.

A-2851-21

During his second recorded statement, defendant claimed a group of Trinitarios gang members shot at him. After further questioning by Detective Rodriguez, defendant admitted being at the scene of the January 8, 2013 shooting, but denied he shot anyone. Rodriguez accused defendant of lying. The detective explained defendant would not likely see his family, particularly his younger sister who considered defendant to be a father figure, if defendant continued lying.

Upon further questioning, defendant admitted having a gun and firing two shots toward the group of people walking near the Home Depot. However, defendant maintained his shots did not strike anyone. According to defendant, he discarded the gun in a black trash bag and left the bag in a park near a local church. Defendant claimed the gun was subsequently moved from that location.

Detective Rodriguez said he would try to request a bail reduction if defendant retrieved the gun. Defendant then asked the detective if "the gun has a number" and, if defendant fired the gun, could the police check the "number" associated with the gun to determine defendant "didn't kill [Siri]." Rodriguez responded, "Of course."

Based on Detective Rodriguez's response, defendant agreed to retrieve the gun, which he said was in the basement of his home. Accompanied by

5

Rodriguez and other Passaic Police Department personnel, defendant went to his home and retrieved a gun and ammunition from his basement. However, the gun, a starter pistol, was inoperable and unconnected to the January 8 shooting. While the ammunition retrieved from defendant's basement was the same caliber as bullets fired during the shooting, the ammunition was not linked to Siri's death.

After defendant retrieved the gun and ammunition, he returned to the police station. Detective Rodgriguez then proceeded to interrogate defendant in a third recorded statement. In his third recorded statement, defendant described turning over the gun and ammunition to Detective Rodriguez. Defendant further stated no one forced him to fire his gun on January 8, 2013, but he did so to protect his friend, Flores, from being shot. Defendant claimed he intended to shoot someone named Bibi because Bibi once shot at defendant while he held his little sister and threatened to hurt him and his family.

Defendant was charged with Siri's murder, attempted murder of Zavala and Matos, conspiracy to commit murder, unlawful possession of a firearm, and three counts of possession of a weapon for an unlawful purpose.

Prior to trial, defendant moved to suppress his statements to the police. Defendant argued the police failed to advise him of the crimes he supposedly

A-2851-21

committed, did not honor invocation of his right to remain silent, and neglected to reissue the <u>Miranda</u> warnings before his second recorded statement. After viewing the recorded interrogation sessions and hearing Detective Rodriguez's testimony during the evidentiary hearing, the motion judge denied the suppression motion.

At defendant's first trial, the jury found defendant guilty of two counts of possession of a weapon for an unlawful purpose and one count of unlawful possession of a handgun. However, the jury was unable to reach a verdict on the murder and attempted murder charges. As a result, the judge declared a mistrial on the murder and attempted murder charges.

On June 7, 2016, the judge sentenced defendant on the weapons charges. On the convictions for possession of a weapon for an unlawful purpose, counts three and six, the judge sentenced defendant to ten years in prison with a five-year period of parole ineligibility. On count four, the unlawful possession of a weapon conviction, the judge sentenced defendant to eight years in prison with a four-year period of parole ineligibility. The judge stated the sentences were concurrent.

About five months after defendant's convictions on the weapons charges, defendant was retried on the murder and attempted murder charges. The jury

convicted defendant of first-degree aggravated manslaughter for Siri's death but found defendant not guilty of attempted murder of Zavala.

Defendant moved for a judgment of acquittal or, alternatively, a new trial. In requesting acquittal, defendant argued the judge erred in admitting the starter pistol and ammunition as evidence. The judge denied the motion and sentenced defendant to twenty-five years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge ordered the sentence on murder conviction to run consecutive to the sentences on the weapons convictions.

On appeal, defendant raises the following arguments:

POINT I

> A "SEARCHING AND CRITICAL" REVIEW OF DEFENDANT'S POLICE-OBTAINED CONFESSION DEMONSTRATES THAT DEFENDANT'S CONSTITUTIONAL RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED.

POINT II

> DETECTIVE RODRIGUEZ'S TESTIMONY THAT DEFENDANT WAS GUILTY AND A LIAR "IMPERMISSIBLY COLORED THE JURY'S ASSESSMENT OF DEFENDANT'S CREDIBILITY," WAS IMPROPER PURSUANT TO N.J.R.E. 701, AND WAS PLAIN ERROR. (NOT RAISED BELOW)

A-2851-21

## POINT III

THE COURT'S FAILURE TO PROVIDE A <u>HAMPTON</u> CHARGE REGARDING DEFENDANT'S CONFESSION AND A <u>KOCIOLEK</u> CHARGE REGARDING DEFENDANT'S UNRECORDED ORAL STATEMENT WAS PLAIN ERROR. (NOT RAISED BELOW)

## POINT IV

TESTIMONY ABOUT THE GUN AND BULLETS THAT DEFENDANT LED POLICE TO AND THAT WERE NOT USED IN THE CRIMES VIOLATED RULE 404(b) AND <u>STATE v.</u>, 127 N.J. 328 (1992). AT A MINIMUM, THE TRIAL COURT SHOULD HAVE PROPERLY INSTRUCTED THE JURY.

## POINT V

EXPERT TESTIMONY THAT THE POSITIVE GUNSHOT RESIDUE PROVED THAT DEFENDANT DISCHARGED THE WEAPON VIOLATED N.J.R.E. 702, WAS UNDULY PREJUDICIAL AND OUTWEIGHED ANY PROBATIVE VALUE, AND THUS WAS PLAIN ERROR. ADDITIONALLY, THE PROSECUTOR UNFAIRLY EXPLOITED THIS IMPROPER TESTIMONY IN CLOSING. (NOT RAISED BELOW)

## POINT VI

THE EXPERT'S OPINION ABOUT THE POSITION OF THE VICTIM WAS IMPROPER BECAUSE IT WAS NOT MADE WITH ANY REASONABLE DEGREE OF CERTAINTY AND WAS THUS UNRELIABLE. ADDITIONALLY, THE PROSECUTOR UNFAIRLY EXPLOITED THIS IMPROPER OPINION TESTIMONY IN CLOSING.

9

POINT VII

THE PROSECUTOR'S MISCONDUCT BY REPEATEDLY ATTACKING DEFENDANT DURING CROSS-EXAMINATION, AND DURING SUMMATIONS, DEPRIVED DEFENDANT OF A FAIR TRIAL. U.S. CONST. Amend. XIV; N.J. CONST. Art I, ¶[¶] 1, 10. (PARTIALLY RAISED BELOW)

POINT VIII

THIS COURT SHOULD REMAND FOR RESENTENCING FOR THE COURT TO RECONSIDER THE CONSECUTIVE SENTENCES, STATE v. TORRES, 246 N.J. 246 (2021), AND BECAUSE THE SENTENCE WAS NOT BASED ON COMPETENT, CREDIBLE EVIDENCE IN THE RECORD.

I.

We first consider defendant's argument that he did not knowingly, intelligently, or voluntarily waive his rights and confess to Siri's murder when speaking to the police. As a result, defendant contends his statements, as well as the starter pistol and ammunition, should have been suppressed. We disagree.

We review a trial court's factual findings after a suppression hearing under a deferential standard and must "uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Nyema, 249 N.J. 509, 526 (2022) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We defer to the trial judge's findings,

10

recognizing the trial judge's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Ibid. However, "with respect to legal determinations or conclusions reached on the basis of the facts[,]" our review is plenary. State v. Stas, 212 N.J. 37, 49 (2012) (citing State v. Handy, 206 N.J. 39, 45 (2011)).

"'The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503.'" State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "To ensure that a person subject to custodial interrogation is 'adequately and effectively apprised of his [or her] rights,' the United States Supreme Court developed constitutional safeguards—the Miranda warnings." State v. A.M., 237 N.J. 384, 396 (2019) (quoting Miranda, 384 U.S. at 467). "The failure to administer Miranda warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and any unwarned statements must be suppressed—even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" State v. Tiwana, 256 N.J. 33, 41 (2023) (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)).

For a defendant's waiver of his or her <u>Miranda</u> rights to be valid, the State must prove beyond a reasonable doubt that the waiver was provided knowingly, voluntarily, and intelligently. <u>Nyhammer</u>, 197 N.J. at 400-01. Whether the State met its burden "is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." <u>A.M.</u>, 237 N.J. at 398 (citing <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)). The totality of the circumstances "requires that we 'consider such factors as the defendant's "age, education, and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."'" <u>State v. Sims</u>, 250 N.J. 189, 217 (2022) (quoting <u>Nyhammer</u>, 197 N.J. at 402).

Other relevant factors in a totality of the circumstances analysis include whether police made any "(1) representations that directly conflict[] with the <u>Miranda</u> warnings, (2) promises of leniency by offering counseling as a substitute for jail, and (3) statements that minimize[] the seriousness of the crimes under investigation." <u>State v. L.H.</u>, 239 N.J. 22, 47 (2019).

When neither a complaint nor an arrest warrant have been issued, as in this case, the police are not required to inform the arrestee of the potential charges prior to conducting an interrogation. <u>Sims</u>, 250 N.J. at 217. In <u>Sims</u>,

12

our Supreme Court declined to adopt a bright-line rule "requiring officers to tell an arrestee, not subject to a complaint-warrant or arrest warrant, what charges he faces before interrogating him" because such a rule "would not comport with . . . prior precedent." Id. at 216-17.

At the time of defendant's interrogation, he had been arrested but charges had not been filed. The interrogation consisted of three parts: defendant's first recorded statement at approximately 10:30 on the morning of his arrest; defendant's second recorded statement at approximately 1:00 in the afternoon that same day; and defendant's third recorded statement about an hour after defendant retrieved the gun and ammunition.

Prior to defendant's first recorded statement, as the suppression motion judge found, defendant was read the Miranda rights in Spanish and acknowledged he understood those rights. Further, the motion judge noted defendant initialed and signed the appropriate places on the Miranda waiver form. Based on his review of the recorded interrogation, the judge explained defendant was "clearly engaged with the detective, leaning over the table in a very cooperative . . . demeanor." From the evidence adduced at the suppression hearing, the judge concluded defendant was "clearly aware that he was a suspect of the crime, and that it involved [a] shooting."

Defendant further argued Detective Rodriguez employed coercive tactics in the first recorded statement to compel his confession. He asserted the detective emphasized his little sister and mother needed him and asked who would take care of his family if defendant went to prison. Defendant also claimed statements by the detective, such as "[n]o one's going to hurt you," "[d]on't let me leave without letting me help you," "[d]o things right," "[p]rove to me that you are a responsible man," "this is your opportunity to fix your life," "you're going to jail for a very long time," "you have an ugly heart," "[y]ou're the devil," and "you're going to be behind bars . . . with animals," pressured him to confess to a shooting he did not commit.

In reviewing the entirety of the recorded interrogation, the suppression motion judge found these statements were a "softening up technique" employed by the detective to encourage defendant to talk about his life aspirations and his family. The judge concluded the detective used this technique before asking defendant any substantive questions related to the shooting. In fact, the judge noted the detective often made statements rather than ask questions during defendant's first recorded statement. The judge explained the first recorded statement contained "personal anecdotes" from the detective's own life, who discussed with defendant why a person should "be responsible" in life.

14

Prior to any inculpatory statements by defendant, as the judge found, Detective Rodriguez told defendant he was charged with trying to kill a person. When defendant continued denying involvement in the shooting, the detective responded, "You killed a guy. You killed him. You're on a video, you have gunpowder on your hand, we have everything, brother."

Although the judge noted defendant and Detective Rodriguez "were dancing around the topic" of the shooting during the interrogation, he found defendant was told by the detective that the police found gunpowder residue on defendant's hand and people gave statements implicating defendant in the shooting. Thus, the judge determined "it was [not] an alien notion to the defendant that shooting at someone was involved in charges contemplated." Further, while defendant was under arrest and a suspect in the shooting at the time of the interrogation, the judge found "[t]here was no formal complaint filed."

The suppression motion judge also found no evidence defendant invoked his right to remain silent at any point in the interrogation. The judge concluded Detective Rodriguez terminated the first recorded statement because defendant failed to provide any inculpatory information. The judge found defendant never gave "any hint of his saying I don't want to talk to you."

15

Regarding defendant's second recorded statement, commenced a few hours after completion of the first recorded statement, the motion judge concluded defendant initiated that conversation. Additionally, the judge found no evidence the police persuaded defendant to continue talking. Based on his review of the evidence adduced at the suppression hearing, the judge determined defendant's request to resume speaking with Detective Rodriguez was attributable to defendant's guilty conscience and not any impermissible tactic employed by the police.

Further, the motion judge noted defendant confirmed he wished to continue speaking with Detective Rodriguez prior to the start of the second recorded statement. Before the second recorded statement, the detective pointed to the Miranda waiver form signed and initialed by defendant a few hours earlier. The judge found Detective Rodriguez "held up the signed Miranda waiver that the defendant had executed a few hours earlier, and made reference to it." Based on this evidence, the judge found no intervening event or prolonged time frame between defendant's first and second recorded statements "for there to be a need for a second full Mirandization."

We reject defendant's contention that the State failed to meet its burden of proving beyond a reasonable doubt that his waiver was knowing, intelligent, and

16

voluntary. Defendant argues he was sleep deprived during his three-part interrogation. He further asserts his youth, as defendant was nineteen years old at the time of his arrest, rendered invalid any waiver of his rights. Additionally, defendant contends the police failed to advise him of the offenses he allegedly committed before questioning him. Further, defendant argues Detective Rodriguez undermined the <u>Miranda</u> warnings by implying the detective would try to reduce bail or otherwise help defendant if he confessed to the shooting.

Having reviewed the record, we are satisfied there was sufficient credible evidence to support the suppression motion judge's ruling the State proved beyond a reasonable doubt that defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights. Despite being nineteen years old, defendant was gainfully employed and lived on his own at the time of his arrest. Additionally, in the recorded interrogation, defendant engaged with Detective Rodriguez in a meaningful manner, belying any suggestion he did not understand the detective's questions.

Based on the interrogation questions, defendant knew there was a shooting. Detective Rodriguez told defendant that other individuals gave statements implicating defendant in the shooting. Further, the detective informed defendant that the police found gunpowder residue on defendant's

hand. On this record, we discern no basis to disturb the judge's factual findings and legal conclusions denying the suppression motion.

Defendant also contends Detective Rodriguez impermissibly undermined the Miranda warnings. According to defendant, the detective promised help by stating he would try to reduce defendant's bail. Based on the detective's comments during the interrogation, defendant asserts his motion to suppress should have been granted. We disagree.

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession." State v. O.D.A.-C., 250 N.J. 408, 421 (2022). An officer's claim that a defendant's statements "will not work against" or "could only help" is "at odds with Miranda's warning that a suspect's statements can in fact be used against the person." Id. at 422-23 (citing L.H., 239 N.J. at 44; State v. Puryear, 441 N.J. Super. 280, 298 (App. Div. 2015)). "False promises of leniency—promises 'so enticing' that they induce a suspect to confess—have the capacity to overbear a suspect's will and to render the confession involuntary and inadmissible." L.H., 239 N.J. at 27.

However, our courts recognize a suspect's "'natural reluctance' to furnish details implicating [themselves] in a crime." Id. at 43 (quoting State v. Miller, 76 N.J. 392, 403 (1978)). Officers may engage in certain interrogation tactics

18

to overcome such reluctance by a suspect. Id. at 43-44. For example, officers may appeal to a suspect's "sense of decency and urge[] him to tell the truth for his own sake." Id. at 44 (quoting Miller, 76 N.J. at 405). Specific appeals to a suspect's conscience do not undermine Miranda warnings and are permissible during an interrogation. See State v. Erazo, 254 N.J. 277, 304 (2023) (holding an interrogating officer may be persistent, persuasive, and appeal to an accused's conscience without undermining the accused's Miranda rights).

Based on our review of this record, the suppression motion judge properly rejected defendant's argument on this point. Detective Rodriguez made no promises to defendant. Rather, the detective said he would try to request a bail reduction but also told defendant a reduction might not be possible. Further, during defendant's first recorded statement, Detective Rodriguez used a "softening up technique" to appeal to defendant's sense of decency and conscience. Such interrogation tactics are permissible and nothing in the detective's statements indicated defendant's will was overborne.

We also reject defendant's assertion his second recorded statement and the physical evidence seized as a result of that statement should have been excluded as impermissible under the fruit of the poisonous tree doctrine. State v. Mellody, 479 N.J. Super. 90, 124 (App. Div. 2024) (holding evidence indirectly acquired

19

by police through a constitutional violation is subject to suppression under the exclusionary rule as fruit of the poisonous tree). Defendant argues his constitutional rights were violated because the police failed to reissue the Miranda warnings before defendant's second recorded statement. However, defendant was reminded he signed the Miranda waiver form a few hours earlier before he spoke to Detective Rodriguez a second time. On these facts, there was no need to repeat the Miranda warnings to defendant prior to the second recorded statement, and the evidence seized as a result of defendant's second recorded statement was proper.

## II.

We next consider defendant's argument related to Detective Rodriguez's trial testimony. Defendant contends the detective's statements at trial, exclaiming defendant was guilty and a liar, impermissibly colored the jury's assessment of his credibility. Defendant further asserts the State violated his right to confront witnesses against him through the detective's testimony. According to defendant, Detective Rodriguez impermissibly told the jury he spoke to several people about defendant's involvement in the January 8, 2013 shooting. However, those individuals did not testify at trial. We reject these arguments.

A.

We first address Detective Rodriguez's testimony related to defendant's truthfulness. This testimony was elicited by defense counsel during cross-examination of Detective Rodriguez. Because defendant's attorney never objected to the detective's testimony, we review for plain error. R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.").

N.J.R.E. 701 allows a witness to testify in the form of an opinion or inference if it is "based on the witness' perception" and "will assist in understanding the witness' testimony or determining a fact in issue." The first element is satisfied by "showing the witness had the opportunity, through one or more of his or her senses, to perceive directly the person, object, or event." State v. Gerena, 465 N.J. Super. 548, 568 (App. Div. 2021) (citing State v. LaBrutto, 114 N.J. 187, 197-98 (1989)). While the second element is "not generally difficult to establish," if the testimony is proffered by a police officer, "courts should exercise discretion to prevent jurors from unduly relying on the

views of that law enforcement official." Ibid. (citing State v. McLean, 205 N.J. 438, 460-61 (2011)).

A witness may not "offer an opinion that a defendant's statement is a lie." State v. Tung, 460 N.J. Super. 75, 101 (App. Div. 2019) (citing State v. Frisby, 174 N.J. 583, 594 (2002)). Nor may a witness "'intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out' or 'express a view on the ultimate question of guilt or innocence.'" State v. C.W.H., 465 N.J. Super. 574, 593-94 (App. Div. 2021) (quoting McLean, 205 N.J. at 461). This is especially true for testimony offered by law enforcement witnesses because a jury "may be inclined to accord special respect to such a witness" and "could have ascribed almost determinative significance to that opinion, which went to the heart of the case." Neno v. Clinton, 167 N.J. 573, 586-87 (2001). While an interrogating officer's testimony about a defendant's appearance and behavior during an interrogation is admissible, "an '[officer's] opinions as to defendant's truthfulness and guilt . . . [are] not admissible as either demeanor evidence or lay opinion.'" C.W.H., 465 N.J. Super. at 594 (alterations in original) (quoting Tung, 460 N.J. Super. at 101).

After reviewing the record, we reject defendant's argument the detective's trial testimony undermined defendant's credibility. In the recorded interrogation, defendant made new statements that contradicted his earlier statements to the police. In fact, as part of his trial strategy, defendant sought to convince the jury that he lied to the police when he confessed to the January 8, 2013 shooting.

The jury saw defendant's recorded interrogation. Based on the conflicting statements made by defendant during the interrogation and at trial, coupled with other trial evidence, the jury had to decide whether defendant lied to the police. Here, defendant's own contradictory testimony related to the shooting undermined his credibility and cast doubt as to his truthfulness. Under the circumstances, we are satisfied Detective Rodriguez's testimony regarding defendant's veracity was not clearly capable of producing an unjust result warranting reversal of defendant's convictions.

### B.

We also reject defendant's contention that Detective Rodriguez's testimony violated his constitutional right to confront witnesses against him. According to defendant, Rodriguez testified he spoke to other witnesses who did not testify at trial in violation of the Confrontation Clause. We disagree.

Because defendant did not object to this aspect of the detective's trial testimony, we again review for plain error. R. 2:10-2.

A person charged with a criminal offense has the right to confront witnesses and to cross-examine accusers. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; see also Crawford v. Washington, 541 U.S. 36, 43 (2004); State v. Branch, 182 N.J. 338, 348 (2005). Courts will preclude testimony of a witness who, directly or by inference, "provides information derived from a non-testifying witness that incriminates a defendant at trial." State v. Weaver, 219 N.J. 131, 151 (2014) (citing Branch, 182 N.J. at 350). "When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." State v. Bankston, 63 N.J. 263, 271 (1973).

Here, defense counsel elicited testimony that Detective Rodriguez spoke to Rosario and Matos about the shooting prior to speaking to defendant. Rosario testified at trial but Matos did not. In his direct testimony, Rodriguez never mentioned speaking to Matos or any other witnesses about the shooting. Because defense counsel asked Detective Rodriguez about speaking to Rosario

and Matos, any perceived violation of the Confrontation Clause was not attributable to the State and the error, if any, was harmless.

III.

Defendant next argues the judge should have charged the jury under State v. Hampton, 61 N.J. 250 (1972), because his confession was admitted at both his first trial and second trial. He also contends the judge should have charged the jury under State v. Kociolek, 23 N.J. 400 (1957), because defendant's unrecorded statement, admitting he saw blue dots after the administration of the gunpowder residue test, was introduced as evidence at the first trial. We reject these arguments.

When reviewing a judge's charge to the jury, we "consider whether the charge as a whole was improper." State v. Setzer, 268 N.J. Super. 553, 564 (App. Div. 1993) (citing State v. Wilbely, 63 N.J. 420, 422 (1973)). If the charge as a whole did not produce prejudicial error, then the verdict must stand. Ibid. (citing State v. Coruzzi, 189 N.J. Super. 273, 312 (App. Div. 1983); State v. Thompson, 59 N.J. 396, 411 (1971)).

When instructing a jury, "[t]he trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J.

147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004).

In a Hampton/Kociolek charge, a trial judge instructs the jury its "function [is] to determine whether or not [any written or oral] statement was actually made by the defendant, and, if made, whether the statement or any portion of it is credible." See Model Jury Charges (Criminal), "Statements of Defendant - Allegedly Made" (rev. June 14, 2010).

Pursuant to a Hampton charge, when a defendant's confession is admitted as evidence, the judge shall instruct the jurors "they should decide whether . . . the defendant's confession is true[,]" and if they conclude the confession is "not true, then they must . . . disregard it for purposes of discharging their function as fact finders . . . ." Hampton, 61 N.J. at 272.

A Kociolek charge pertains to the reliability of an inculpatory statement by a defendant to any witness. Kociolek, 23 N.J. at 421-22. The jury should be instructed to "'receive, weigh and consider such evidence with caution,' in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." Id. at 421.

The failure to give a Hampton or Kociolek charge does not automatically constitute reversible error. State v. Jordan, 147 N.J. 409, 428 (1997). Where the statement in question was "unnecessary to prove defendant's guilt because there is other evidence that clearly establishes guilt, or if the defendant has acknowledged the truth of his statement, the failure to give a Hampton charge would not be reversible error." Id. at 425-26. Further, whether failure to give a Kociolek charge constitutes plain error "will depend on the facts of each case." Id. at 428. In some instances, "the circumstances of the trial highlight [the need to determine credibility] more than any charge could have." Id. at 426 (quoting State v. Maldonado, 137 N.J. 536, 575 (1994)).

Here, it was not reversible error to decline issuing a Hampton charge because defendant's confession was not necessary to prove the State's case. The jury considered the recorded police interrogation and heard the testimony from numerous trial witnesses regarding defendant's involvement in the January 8, 2013 shooting. The judge also issued the model jury instruction on credibility for the jury to assess the witnesses' credibility, including defendant's credibility. We are satisfied the jury understood they had to determine defendant's credibility regarding his confession and whether he lied or told the truth to the police during the recorded interrogation.

A-2851-21

Regarding defendant's unrecorded inculpatory statement, agreeing he saw blue dots on his hand after police performed the gunpowder residue test, the failure to give a Kociolek charge was not reversible error. At the first trial, defendant testified about blue dots on his hands as part of his discussion with Detective Rodriguez. The State called witnesses in the first trial who testified blue dots were indicative of a positive test for gunpowder residue. Under the circumstances, the first trial highlighted the need for the jury to determine defendant's credibility more than any jury charge. Additionally, the judge issued the model jury charge for assessing the credibility of witnesses.

Having reviewed the record, we are satisfied the failure to give a Hampton and Kociolek charge to the jury was not capable of producing an unjust result warranting reversal of defendant's convictions.

IV.

Defendant next contends the judge abused his discretion in admitting the starter pistol and ammunition found in defendant's basement as evidence at trial. We disagree.

We review a trial court's evidentiary rulings for abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). "The decision to admit or exclude evidence is . . . entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580

(2018). However, we review the evidentiary ruling de novo if the trial court fails to apply the proper legal standard. State v. Trinidad, 241 N.J. 425, 448 (2020) (citing State v. Garrison, 228 N.J. 182, 194 (2017)).

The judge analyzed the admission of the starter pistol and ammunition under Cofield, 127 N.J. at 338. After applying the Cofield factors, the judge determined the gun was highly relevant evidence of defendant's "mens rea and his overall guilt." While the weapons charges were not before the jury in defendant's second trial, the judge concluded "[the starter pistol] [wa]s part and parcel of the case."

Further, the judge found the items retrieved from defendant's basement were intrinsic evidence demonstrating defendant's consciousness of guilt. By leading the police to a gun defendant knew was not used during the January 8 shooting, defendant sought to convince the police he did not fire any fatal shots that night. Because the jury did not need to decide whether defendant illegally possessed a firearm in defendant's second trial, the judge properly determined admitting the starter pistol and ammunition as evidence in the second trial was not so prejudicial as to deprive defendant of a fair trial.

In Cofield, the Court established a four-part test regarding the admissibility of evidence:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

Applying the Cofield factors here, the starter pistol, although inoperable, was a gun, rendering it similar to the weapon used to shoot Siri. Defendant gave the starter pistol and ammunition to the police reasonably close in time to the shooting. Further, in his second recorded statement, after reflecting on his first recorded statement a few hours earlier, defendant voluntarily told police where the gun could be found. Also, the ammunition from defendant's basement was the same caliber as bullets fired during the shooting. However, the ammunition was not connected to Siri's death.

After reviewing the record, we discern no abuse of discretion in the judge's admission of the starter pistol and ammunition as evidence in defendant's second trial. During the police interrogation, defendant confirmed the police could examine the gun and determine whether the examined weapon fired the fatal

shot that killed Siri. Upon reassurance the police could examine the gun and make such a determination, defendant led the police to a gun he knew was unconnected to the January 8 shooting. Defendant did so in an effort to convince police he did not fire the fatal shot that night. Under the circumstances, we agree the inoperable starter pistol and ammunition were properly admitted as evidence for the jury to consider defendant's consciousness of guilt.

V.

We next address defendant's assertion that the judge erred in admitting the testimony of the State's gunpowder residue expert. Defendant also argues the prosecutor's reference to this expert's testimony in summation constituted prosecutorial error. We disagree.

As we previously stated, we review a trial judge's evidentiary rulings for abuse of discretion. Garcia, 245 N.J. at 430. The admission of expert testimony under N.J.R.E. 702 is within the trial court's discretion. State v. Cotto, 471 N.J. Super. 489, 531 (App. Div. 2022). Decisions regarding the admission of testimony are reversed only "for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)). Because defendant did not object to the testimony of the State's gunpowder residue expert, we review for plain error. R. 2:10-2.

Expert testimony may be admitted "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. An expert's testimony must satisfy the following:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Jenewicz, 193 N.J. at 454 (citing State v. Kelly, 97 N.J. 178, 208 (1984); State v. Townsend, 186 N.J. 473, 491 (2006)).]

Defendant raises two arguments regarding the testimony of the State's gunpowder residue expert. First, defendant asserts the expert offered inherently contradictory testimony in defendant's two trials. Second, defendant contends the expert's testimony was unduly prejudicial.

In the second trial, the State's expert testified a positive gunpowder residue test "does not prove that that person fired the weapon." He further testified the test provides "reasonable knowledge that [a] . . . person fired a weapon."

In the first trial, the same expert testified "[u]sing the knowledge that you have how people . . . hold a . . . weapon, if they discharge a weapon, . . . it will

32

cause a blue speck." He further testified that the gunpowder residue test "has a sensitivity to react with . . . levels of a residue that we would expect to see when someone discharged a firearm."

After reviewing the record, we are satisfied the expert's statements in defendant's two trials were not contradictory and comported with the requirements for admission of an expert's testimony. As the State's expert explained, a person who fires a gun is likely to have a positive test result, but not everyone who tests positive fired a gun. The expert told the jury that nitrates, a substance found in gunpowder, are also found in cigarettes and fertilizers. Consistent with the expert's testimony, the judge instructed the jury that the results of a gunpowder residue test are "not considered to be conclusive as to the presence of gunpowder. It can, however, conclusively establish the presence of nitrates, which is an important . . . mineral contained in gunpowder."

Nor was the testimony of the State's gunpowder residue expert unduly prejudicial. The expert, based on his training and experience, provided testimony for the jury's consideration regarding a positive test for gunpowder residue. The judge instructed the jury that it could accept or reject the expert's testimony. Further, in neither trial did the State's expert opine on defendant's guilt so as to usurp the jury's function as to the ultimate issue in the case.

After reviewing the testimony of the State's gunpowder residue expert, we discern nothing improper. Defense counsel had ample opportunity to cross-examine the expert on the positive test for gunpowder residue and address any perceived contradictory testimony in summation. On this record, the judge did not abuse his discretion in allowing the testimony of the State's gunpowder residue expert to assist the jury in understanding gunpowder residue testing. The expert's testimony was not capable of producing an unjust result warranting reversal of defendant's convictions.

Because we agree admission of testimony from the State's gunpowder residue expert was proper, the prosecutor's references to that testimony in summation did not constitute prosecutorial error.

## VI.

Defendant also challenges the admission of testimony from the State's medical examiner. He asserts the medical examiner's testimony in the first trial contradicted his testimony in the second trial. Further, defendant contends the medical examiner failed to proffer his opinions within a degree of medical certainty. We reject these arguments.

In the second trial, defendant sought to strike the medical examiner's testimony. The judge denied the application, finding the expert could offer his

opinion "based on his experience" without uttering the "catch phrase" that his opinions were within a degree of scientific certainty. As the judge explained, the medical examiner's testimony was limited to two scenarios regarding the position of the victim after being shot—either the victim was running or ducking when the shots were fired. Thus, the judge concluded "there's fodder for cross here and I think that will adequately address the issue."

We review a judge's decision to admit expert testimony for abuse of discretion. Cotto, 471 N.J. Super. at 531. An expert offering scientific opinion testimony must do so with a reasonable degree of certainty or probability. State v. Fortin, 178 N.J. 540, 597 (2004). However, an expert is not required to use "talismanic" or "magical words" when expressing an opinion, it is enough that a court is "persuaded that 'the doctor was reasonably confident'" of the opinion. Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (quoting Aspiazu v. Orgera, 535 A.2d 338, 343 (Conn. 1987)).

Once an expert's opinion testimony is admitted, "the data and the totality of the facts on the basis of which the expert arrived at the opinion must be made known to the factfinder so that it may evaluate the validity of the opinion and conclude what weight, if any, it should give to that opinion." State v. Atwater, 400 N.J. Super. 319, 334 (App. Div. 2008) (quoting Biunno, Weissbard & Zegas,

Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 703 (2008)). Further, the bases on which the expert's testimony relies are subject to cross-examination, Jenewicz, 193 N.J. at 466, and should assist the jury in determining the credibility, weight, and probative value of the expert's opinion. State v. Martini, 131 N.J. 176, 264 (1993). Accordingly, a trial court should "give a limiting instruction to the jury 'that conveys to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion . . . .'" State v. Torres, 183 N.J. 554, 580 (2005) (quoting State v. Berry, 140 N.J. 280, 304 (1995)).

Here, defense counsel cross-examined the State's medical examiner on the degree of certainty in rendering his opinions. Defense counsel thoroughly explored the medical examiner's conclusions regarding the position of the victim at the time he was shot. Defense counsel cited the medical examiner's purportedly contradictory testimony in summation. As the judge instructed, the jury was "not bound by any opinion offered by [the] experts" and should "consider each opinion and give it the weight to which [they] deem it is entitled, whether that be great or slight, or [they] may reject it." Further, the judge told the jury it was "within the special function of the jury to determine whether the facts on which the . . . answer or testimony of an expert is based actually exist"

36

and that the weight they should give the opinion "is dependent upon and no stronger than the facts on which it is based."

Having reviewed the testimony of the State's medical examiner, we are satisfied the testimony provided the reasons for the expert's opinions and conclusions. Moreover, the medical examiner's education, experience, and expertise allowed him to narrow his opinions based on the position of the victim—Siri was either running or ducking at the time the shots were fired. While the medical examiner did not state his opinions were within a "degree of scientific certainty," his conclusions were based on his examination of Siri's body and his years of experience in the field of forensic pathology. Under the circumstances, we discern no abuse of discretion in the judge's admission of testimony from the State's medical examiner.

Because we agree admitting the testimony of the State's medical examiner was proper, the prosecutor's references to that testimony in summation did not constitute prosecutorial error.

VII.

We next address defendant's argument that the prosecutor erred by repeatedly attacking defendant during cross-examination and in closing argument, depriving him of a fair trial. We disagree.

 A-2851-21

Reversal for prosecutorial error is appropriate only when the misconduct is so egregious as to deprive the defendant of a fair trial. State v. Pressley, 232 N.J. 587, 593-94 (2018). In reviewing closing arguments, the court should look "not to isolated remarks, but to the summation as a whole." Atwater, 400 N.J. Super. at 335 (citing State v. Carter, 91 N.J. 86, 105 (1982)). "In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court 'must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Frost, 158 N.J. 76, 83 (1999) (quoting State v. Marshall, 123 N.J. 1, 153 (1991)). Further, the court should consider whether the defense made timely objections to the remarks, whether the remarks were withdrawn promptly, and whether the court ordered the remarks stricken from the record. Ibid. If a defendant fails to object to a prosecutor's comments at trial, the challenged comments are reviewed for plain error, and an appellate court can only reverse if the error was "clearly capable of producing an unjust result." Pressley, 232 N.J. at 593 (quoting R. 2:10-2).

"Prosecutors may fight hard, but they must also fight fair." State v. Pennington, 119 N.J. 547, 577 (1990), overruled on other grounds by State v. Brunson, 132 N.J. 377, 392 (1993). Derogatory name-calling constitutes

misconduct, State v. Clausell, 121 N.J. 298, 341 (1990), but commenting on the credibility of a defendant's testimony does not. State v. Robinson, 157 N.J. Super. 118, 120 (App. Div. 1978). A prosecutor "may point out discrepancies in a witness's testimony or a witness's interests in presenting a particular version of events," State v. Johnson, 287 N.J. Super. 247, 267 (App. Div. 1996), but may not "express his personal opinion on the veracity of any witness." State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014). Inconsistencies between two or more statements or a statement and testimony at trial may be used to impeach the validity of the statements, so long as they are not used as substantive evidence on the issue of defendant's guilt or innocence. State v. Tucker, 190 N.J. 183, 190-91 (2007) (citing State v. Brown, 190 N.J. 144, 158 (2007)).

The failure to object to inappropriate comments "suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, 158 N.J. at 84. Although counsel may be reluctant to raise an objection during summation, making a timely objection allows the court to take curative action. State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997). A curative instruction may be sufficient to alleviate any prejudice that might result from a prosecutor's improper remark. See State v. Jenkins, 349 N.J. Super. 464, 479 (App. Div. 2002).

Here, in the first trial, defense counsel twice objected to remarks by the prosecutor. First, when defendant testified that Rosario lied during his testimony, the prosecutor remarked he was surprised Rosario's "nose didn't grow outside the courtroom" as a result of the alleged lies. The judge sustained defense counsel's objection and the prosecutor withdrew the question. The second instance involved defendant's testimony that he did not know how police found the names of his friends. When the prosecutor suggested it "was just magically given to the police," defense counsel objected. The judge sustained the objection and admonished the prosecutor to ask questions and refrain from making comments. Regarding the prosecutor's third comment during cross-examination of defendant in the first trial, stating "so, now, the Passaic Police are hiding evidence," defense counsel did not object.

These comments by the prosecutor implied defendant was a liar and were fair comments based on the trial evidence. At trial, defendant admitted he had lied. In the recorded interrogation, the jury heard defendant give contradictory statements to the police about the shooting and his involvement. Because defendant attempted to convince the jury he lied to the police, it was not improper for the prosecutor to cast defendant as a liar.

In the second trial, during closing arguments, the prosecutor stated Rosario was "a piece of shit," and asked the jury "[d]o you think murderers hang around with the best people in the community? They hang around with … pieces of shit." Defense counsel did not object to this comment. Defendant claims the prosecutor's statement impermissibly implied defendant was a murderer because he was Rosario's friend.

These instances of alleged prosecutorial error must be viewed in the context of both trials. While the prosecutor made negative comments about defendant in both trials, his comments did not rise to the level of misconduct to warrant a reversal of defendant's convictions. When defense counsel objected to an inappropriate comment by the prosecutor, the court sustained the objection, and the comment was either withdrawn or stricken from the record. Based on the entirety of the trial record, the other instances of purported prosecutorial error cited by defendant were not so egregious as to cause defense counsel to object.

Because the alleged improper comments by the prosecutor were withdrawn, struck from the record, or not objected to by counsel, we are satisfied those comments did not result in egregious prejudice so as to deprive defendant of his right to a fair trial.

41

## VIII.

We address defendant's alternative argument that the judge abused his discretion in sentencing defendant, warranting resentencing. Defendant contends it was improper for the judge to sentence him to consecutive terms without considering his age. He also requests a remand for the judge to assess the overall fairness of the sentence under Torres, 246 N.J. at 268. We reject defendant's sentencing arguments.

We review a sentencing determination under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015). "On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire range." State v. Pierce, 188 N.J. 155, 169-70 (2006). "[T]he deferential standard of review applies only if the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion." Trinidad, 241 N.J. at 453 (quoting State v. Case, 220 N.J. 49, 65 (2014)).

With respect to a decision whether to impose concurrent or consecutive sentences, a sentencing court should adhere to the principle that "there can be no free crimes in a system for which the punishment shall fit the crime." State

v. Carey, 168 N.J. 413, 422 (2001) (quoting State v. Yarbough, 100 N.J. 627, 643 (1985)).  Thus, a sentencing court should consider the extent to which:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims; [and]
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Id. at 422-23 (quoting Yarbough, 100 N.J. at 644).]

A sentencing judge is required to weigh these criteria qualitatively rather than quantitatively.  Id. at 427.  The judge must separately state the reasons for imposing a concurrent or consecutive sentence in the sentencing decision. Yarbough, 100 N.J. at 643.  A proper sentencing assessment requires the judge provide "[a]n explicit statement [] explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings." Torres, 246 N.J. at 268.

In defendant's first trial, the judge sentenced defendant to two concurrent terms of imprisonment for ten years with a five-year period of parole ineligibility for possession of a firearm for an unlawful purpose concurrent to an eight-year term of imprisonment with a four-year period of parole ineligibility for unlawful possession of a firearm. After the jury convicted defendant of aggravated manslaughter in the second trial, the judge sentenced him to a term of twenty-five years consecutive to the prison sentences imposed as a result of defendant's convictions in the first trial.

Here, the sentencing judge appropriately analyzed the aggravating and mitigating factors under N.J.S.A. 2C:44-1. In considering aggravating factor one, N.J.S.A. 2C:44-1(a)(1), the heinousness of the act, the judge found the shooting was "a deeply cowardly act," but was not "especially heinous." Thus, the judge declined to apply aggravating factor one. In considering aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk defendant would commit another offense, the judge noted defendant's gang membership made it likely he would reoffend. Thus, the judge gave "very significant weight" to this factor. Additionally, the judge applied aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter defendant and others from further acts of violence.

A-2851-21

The sentencing judge applied mitigating factor six, N.J.S.A. 2C:44-1(b)(6), defendant's willingness to compensate the victim's family. However, the judge declined to give that factor significant weight. The judge also applied mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), defendant's lack of prior delinquency or criminal activity. After applying these mitigating factors, the judge found the aggravating factors "substantially outweigh[ed]— overwhelmingly outweigh[ed]" the mitigating factors.

Contrary to defendant's sentencing arguments, the judge considered defendant's age. The judge specifically noted defendant would be released after serving his sentence as a "comparatively young man." Because defendant was sentenced prior to the amended statute adding consideration of a defendant's age as a sentencing factor, the judge was not required to consider defendant's youth in sentencing. However, the judge did so in determining defendant's sentence.

Additionally, the sentencing judge addressed the Yarbough factors and found there were two different victims and "separate acts of violence . . . with each pull of the trigger." Moreover, the judge explained it was only "by luck" that Zavala and others were not seriously injured when defendant fired his gun.

Further, in ordering the sentence on the aggravated manslaughter conviction consecutive to the weapons convictions in the first trial, the judge

explained there were two victims and crimes that were "predominantly independent of each other," justifying the consecutive sentences. Thus, the judge concluded there "absolutely" was a "need for punishment to be meted out for both of those crimes as they affect both" Siri and Zavala.

We also reject defendant's argument there is no evidence in the record regarding gang activity. Defendant asked the police not to incarcerate him with members of a certain gang. Further, on the Gang Member Identification Form/Interview Form completed in connection with the police interrogation, defendant indicated he was a member of a specific gang, and requested he be housed with fellow members. While counsel stipulated the term "gang" would not be used during the trial, there was credible evidence in the record at sentencing supporting defendant's affiliation with a gang.

Even if evidence of defendant's gang affiliation was limited, the evidence proffered at trial indicated defendant and his friends were in search of a fight the night of January 8, 2013. Thus, to the extent defendant may not have been officially affiliated with a gang, the judge recognized the need to deter defendant and his friends from committing further acts of violence.

We also reject defendant's request that we remand for resentencing under Torres. We do not construe Torres as creating a new rule of law requiring

retroactive application.  See State v. Lane, 251 N.J. 84, 87 (2022) (finding mitigating factor fourteen, consideration of a defendant's age at the time of the offense, was prospective and did not apply to individuals sentenced prior to October 19, 2020, the effective date of N.J.S.A. 2C:44-1(b)(14)).  Here, defendant was sentenced for aggravated manslaughter in 2016, well before enactment of the amended statute and prior to the Torres decision.

On this record, we are satisfied the sentencing judge considered the relevant factors and followed the applicable law in sentencing defendant, and the sentence imposed was not an abuse of discretion.  Moreover, the sentencing judge properly assessed the overall sentence in light of the nature of the offense, as well as the aggravating and mitigating factors, and determined the sentence imposed was fair under the circumstances.

To the extent we have not specifically addressed any of defendant's arguments, we conclude they lack sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2851-21